IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TONY PETTIFORD, | ) CASE NO. 1:21-CV-77 |
| Plaintiff, | ) |
| vs. | ) MAGISTRATE JUDGE |
| | ) JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| Defendant. | ) **MEMORANDUM OF OPINION AND ORDER** |

Plaintiff, Tony Pettiford ("Plaintiff" or "Pettiford"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying his application for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is VACATED AND REMANDED for further proceedings consistent with this opinion.

## I. PROCEDURAL HISTORY

In February 2019, Pettiford filed applications for POD, DIB, and SSI alleging a disability onset date of August 10, 2018 and claiming he was disabled due to high blood pressure, heart murmur, and back spasm. Transcript ("Tr.") at 153, 166, 299. The application was denied initially and upon reconsideration, and Pettiford requested a hearing before an administrative law judge ("ALJ"). Tr. 224.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

On June 30, 2020 an ALJ held a hearing, during which Pettiford and an impartial vocational expert ("VE") testified. Tr. 139-152. On July 14, 2020, the ALJ issued a written decision finding that Pettiford was not disabled. Tr. 11-19. The ALJ's decision became final on November 18, 2020, when the Appeals Council declined further review. Tr. 1-4.

On January 12, 2021, Pettiford filed his Complaint to challenge the Commissioner's final decision. Doc. No. 1. The parties have completed briefing in this case. Doc. Nos. 16, 17. Pettiford asserts the following assignments of error:

> (1) Whether the decision erred by finding that the claimant's bilateral knee osteoarthritis did not constitute a severe impairment.
>
> (2) Whether the decision erred by rejecting the medical opinion of social security's consultative examiner.

Doc. No. 16, p. 1.

## II. EVIDENCE

**A.** **Personal and Vocational Evidence**

Pettiford was born in 1968 and was 49 years-old on his alleged onset date. Tr. 18. He has at least a high school education. Tr. 18. He has past relevant work as a medical transportation driver. Tr. 149.

**B.** **Relevant Medical Evidence[2]**

On October 20, 2017, Pettiford reported shortness of breath for the past week (he was unable to walk short or long distances without losing his breath) and general weakness/tiredness. Tr. 395. He had been out of his blood pressure medication for 2-3 months. Tr. 395. His medication was reordered. Tr. 396.

On November 28, 2017, Pettiford saw his primary care physician, Dr. Downes. Tr. 391. He reported intermittent leg swelling. Tr. 391.

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

On January 28, 2019, Pettiford went to the emergency room after a car accident two days prior, complaining of stiffness in his neck, back and shoulders and low back pain. Tr. 388-389. Upon exam, he had decreased range of motion and pain in his left shoulder. Tr. 390. A cervical spine x-ray showed straightening of the normal cervical lordosis and mild to moderate degenerative changes at C4-5, C5-6. Tr. 438. He was assessed with a muscle strain and given a prescription for ibuprofen. Tr. 390.

On February 27, 2018, Pettiford went to the emergency room for chest pain and shortness of breath. Tr. 381. He did not take Lasix on a regular basis. Tr. 381. His exam findings were normal, a chest x-ray showed no acute cardiopulmonary process, and he was discharged as stable without a diagnosis and advised to follow up with his primary care doctor. Tr. 383. On March 7, Pettiford saw Dr. Downes for a follow-up. Tr. 379. He no longer had shortness of breath or chest pain but he had leg swelling. Tr. 379. Dr. Downes ordered an echocardiogram. Tr. 380.

On June 19, 2018, Pettiford went to the emergency room for shortness of breath while doing physical activity at work. Tr. 361. He reported experiencing shortness of breath for the last 3-4 months. Tr. 361. He also reported an increase in ankle swelling despite taking diuretics. Tr. 361. He had an echocardiogram in April 2018, which was normal, and had missed appointments with a cardiologist and his primary care doctor. Tr. 361, 369. He reported that he "tends to miss some of his medication doses." Tr. 361. Upon exam, he had full range of motion in his extremities and lower leg swelling. Tr. 362. A chest x-ray showed pulmonary interstitial markings and possible trace pleural effusions, findings which could be secondary to pulmonary edema or infection. Tr. 419. An EKG test showed sinus tachycardia. Tr. 362. He was admitted for acute onset left-sided heart failure with hypertensive urgency, treated with medication, felt better, and was discharged on June 21. Tr. 371, 375. A heart failure consult, echocardiogram exercise stress test, and sleep study for sleep apnea were requested. Tr. 375.

3

On June 25, 2018, Pettiford reported that he felt better, was back at work, and was taking all his medications as directed.  Tr. 359.

On July 24, 2018, Pettiford saw cardiology for a follow-up.  Tr. 354-355.  He still had leg swelling but it had improved, and he stated that he was compliant with his medications and feeling well and "unlimited."  Tr. 355, 357.  His blood pressure medication was increased.  Tr. 347.

On June 12, 2019, Pettiford saw Dorothy Bradford, M.D., for a consultative exam.  Tr. 589-595.  His chief complaint was heart problems and low back pain.  Tr. 594.  He stated that he had been hospitalization in 2016 for shortness of breath and that, since that time, he cannot stand for a long time or lift much.  Tr. 594.  His legs swell and he wakes up short of breath.  Tr. 594.  He denied orthopnea (shortness of breath lying down), chest pain or palpitations.  Tr. 594.  His back pain was constant, due to multiple accidents, but he had had no recent treatment.  Tr. 594.  Upon exam, his heart had a regular rate and rhythm, his lungs were clear, he had bipedal edema up to his knees, no tenderness in his spine but a decreased range of motion, normal muscle strength in all muscle groups, normal range of motion in all joints and no joint effusion, an even, regular gait with no apparent limp, shuffle or other disturbance, intact reflexes, and no neurological deficits.  Tr. 595.  The manual muscle testing sheet indicated that Pettiford had a slightly decreased range of motion in his hips.  Tr. 593.  An x-ray of his lumbar spine showed diffuse lumbar posterior element and SI joint arthritis with normal alignment.  Tr. 593.  Dr. Bradford wrote that Pettiford had a history of chronic heart failure due to hypertensive disease, he was "currently well compensated and is a NYHA Class II,"[3] had chronic L4-L5 spondylolysis without radiculopathy, and he was morbidly obese.  Tr. 595.  She concluded that he should be restricted to sedentary activity.  Tr. 595.

On August 14, 2019, Pettiford saw Dr. Downes for his annual exam.  Tr. 604.  He complained

---

[3] NYHA is the New York Heart Association classifications; Class II is mild symptoms and slight limitation during ordinary activity.  *See* https://manual.jointcommission.org/releases/TJC2018A/DataElem0439.html (last visited 1/11/22).

4

of chronic low back pain that had flared up recently and was worse with ambulation. Tr. 604. Upon exam, he had paraspinal muscle spasms and he was moving all extremities and ambulating without assistance. Tr. 606. He was assessed with low back pain and prescribed Norco. Tr. 607.

On September 5, 2019, Pettiford saw a rheumatologist for an evaluation. Tr. 601. He reported neck and back pain for years and right knee pain for two months. Tr. 601. His right knee pain developed slowly, worsened with prolonged activity, and sometimes buckled and almost gave out. Tr. 601. His neck and back pain were getting worse and caused difficulty walking long distances and he had started to limp. Tr. 601-602. He was taking Norco. Tr. 602. Upon exam, he was tender to palpation in his lumbar paraspinals, had a full range of motion in his hips, a negative Faber test, and full range of motion in his knees, pain on full extension of his right knee and lateral joint line tenderness to palpation but no ligamentous laxity or obvious swelling. Tr. 603. Knee x-rays were ordered and he was referred to physical therapy for his knees and back. Tr. 604. He was assessed with likely osteoarthritis with flare up and he declined an injection. Tr. 604.

On September 11, 2019, Pettiford sought treatment for knee pain, right worse than left, for years but worse the last three months. Tr. 600. He also reported back pain and denied hip pain. Tr. 600. He walked up to 50 feet without an assistive device and used a motorized scooter for longer distances. Tr. 600. Upon exam, his gait was described as "stiff knee" and he had tenderness in his knees and hips. Tr. 600. He had 5-/5 muscle strength and moderate crepitus and grinding in his knee. Tr. 600. X-rays of his knees showed "2 mm medial joint space remaining, patellofemoral narrowing and spurring but cannot assess amount without patellar views." Tr. 601. X-rays of his hips showed mild degenerative arthritis, slightly worse on the left, and "pincer-type acetabular impingement on the left is considered." Tr. 609. An x-ray of his lumbar spine showed osteoarthritis caudally, most prominent on the right side. Tr. 613. He was assessed with bilateral knee and hip arthritis, chronic low back pain and morbid

obesity. Tr. 602. He elected conservative treatment (topical NSAIDs and acetaminophen, aquatic physical therapy) and declined an injection. Tr. 601.

On October 31, 2019, Pettiford started physical therapy; he did not do aquatic therapy because his insurance wouldn't cover it. Tr. 630, 655. He reported a long history of low back pain, right knee pain for several months, and having had multiple motor vehicle accidents the last three years and seeing a chiropractor. Tr. 631. His back pain was constant, varied from 6-10 to 10/10, and worsened with prolonged sitting, standing, and walking and improved with "nothing." Tr. 631. He had difficulty standing and walking long distances. Tr. 631. Upon exam, he had 5/5 strength in his lower extremities, 4-/5 strength in his transversus abdominis muscle, negative straight leg raise testing, decreased range of motion in his trunk, tenderness to palpation in his posterior superior iliac spine, his gait was independent and slow, and his sit to stand transition was labored but independent. Tr. 631-632. His Oswetry Back Pain score, based on subjective answers regarding back pain, corresponded with a rating of a 66% disability. Tr. 632. He was assessed as having instability and obesity, decreased range of motion, decreased functioning, decreased knowledge of home exercises, and postural deviation. Tr. 632. The physical therapist stated, "focus today on back, will get to the knees in the future." Tr. 632.

On November 19, 2019, at his third physical therapy visit, he rated his low back pain 8/10, reported no relief from stretches and that they increased his pain, and difficulty "being straight"; his posture was noted to be abnormal. Tr. 623. He was assessed as having no relief from his home exercise program with notable lack of mobility due to pain and being unable to sustain correct posture control. Tr. 624. After that visit he had an appointment with Dr. Downes for back and knee pain. Tr. 620. He reported being "in pain" in his back and knees. Tr. 620. Upon exam, he had a decreased range of motion in his knees and paraspinal muscle spasms in his lumbar area. Tr. 622. He was prescribed

6

Norco and his joint pain was assessed as "uncontrolled." Tr. 622. His blood pressure was high, which Dr. Downes stated was likely due to pain. Tr. 623.

On November 29, 2019, Pettiford went to the emergency room for right knee pain that had begun the day before. Tr. 657, 659. He reported pain while lifting his leg or bending his knee and he was unable to bear weight. Tr. 657. He had not taken any medications for pain; "he was not sure what he could take." Tr. 657. Upon exam, he had decreased range of motion, swelling, and diffuse tenderness in his right knee but no redness or warmth. Tr. 659, 660. A right knee x-ray showed moderate joint effusion and no fractures or evidence of significant degenerative arthritis. Tr. 659. He was given a knee immobilizer for comfort. Tr. 660.

On December 6, 2019, Pettiford had a follow up and stated that his knee pain and swelling had decreased and that he could move it a little more. Tr. 655. His home exercises from physical therapy were difficult. Tr. 655. Upon exam, his gait was "stiff knee on right," he had a mild varus malalignment in both knees, moderate effusion of his right knee, tenderness in his right knee and hips, 5-/5 muscle strength in his hip flexors, hamstrings and quadriceps, moderate crepitus and grinding in his knees, right more than left, reduced range of motion, and mild straight leg raise testing and diffuse pain during a McMurry's test. Tr. 655. He was assessed with bilateral hip and knee arthritis, chronic low back pain with sciatica, and morbid obesity. Tr. 656. He received a cortisone injection in his right knee for his flare-up and was encouraged to continue weight loss and physical therapy. Tr. 656.

On December 9, 2019, Pettiford had a sleep study, which showed "extremely severe sleep disordered breathing." Tr. 651. On December 17, Pettiford saw Dr. Downes for hypertension, test results, and a follow up from his ER visit for right knee pain. Tr. 647. He was trying to lose weight with diet and exercise and the note says, "has pain in r knee saw ortho." Tr. 648. Upon exam, he moved

all extremities and ambulated without assistance. Tr. 649. On December 19, a c-pap machine was ordered for Pettiford's sleep apnea. Tr. 647.

On March 17, 2020, Pettiford had a tele-med appointment with Dr. Downes for routine care. Tr. 643-644. His active problem list included hypertension, heart failure with preserved injection fraction, arthritis of both knees, morbid obesity, state 3 chronic kidney disease, arthritis of both hips, and lumbar spondylosis. Tr. 644. His encounter diagnosis was listed as essential hypertension, listed as stable, and all his medications were refilled. Tr. 646-647.

**C.     State Agency Reports**

On June 26, 2019, Yacob Gawo, M.D., reviewed Pettiford's record and opined that, regarding his residual functional capacity, he could perform light work (lift 20 pounds occasionally and 10 pounds frequently, stand/walk for 6 hours a workday and sit for 6 hours a workday) with postural limitations based on degenerative disc disease in his cervical and lumber spine, his hypertension and heart failure, and morbid obesity. Tr. 160, 163. On December 12, 2019, Yeshwanth Bekal, M.D., agreed with Dr. Gawo's opinion. Tr. 203-206.

**D.     Hearing Testimony**

During the June 30, 2020 hearing, Pettiford appeared *pro se* and testified to the following:

- He lives alone in a first floor apartment. Tr. 147. When asked if he does the cleaning and shopping, he stated, "I can do it." Tr. 147. Sometimes his friends and family help but they can only do so much. Tr. 147. He does not go outside much. Tr. 147.

- When asked what impairments keep him from working, he stated that he has an upper respiratory problem that requires a machine to help him breathe. Tr. 144. He has a heart condition and high blood pressure. Tr. 144. He clarified that the machine he has to help him breathe is a mask he wears at night for sleep apnea. Tr. 144-145.

- He goes to the doctor at least once every three months. Tr. 146. His doctors also give him medication for his heart "and I have a condition standing up for a long time" because of his hips. Tr. 146. He also has arthritis in his knees and his back "and I fall asleep." Tr. 148.

The VE testified that Pettiford had past work as a medical transportation driver. Tr. 149. The ALJ asked the VE whether a hypothetical individual with the same age, education and work experience as Pettiford could perform his past work or any other work if the individual had the following residual functional capacity: he could perform light work except he cannot climb ladders, ropes or scaffolds or crawl; can occasionally climb ramps and stairs, bend, stoop, kneel, and crouch; must avoid concentrated exposure to temperature extremes, humidity or environmental pollutants; and can never be exposed to heights, machinery, or commercial driving. Tr. 149. The VE testified that the hypothetical individual would not be able to perform Pettiford's past work but could perform the following representative jobs in the economy: cashier, price marker, and router. Tr. 149-150.

Pettiford advised that, with respect to his ability to perform light work, "I have the severe apnea I fall asleep sometimes." Tr. 151.

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a). A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Pettiford was insured on the earliest possible disability onset date, August 10, 2018, and remained insured through December 31, 2022, his date last insured ("DLI."). Tr. 11. Therefore, in order to be entitled to POD and DIB, Pettiford must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2. The claimant has not engaged in substantial gainful activity since August 10, 2018, the alleged onset date (20 CFR 404.1571 *et seq*. and 416.971 *et seq*.).

3. The claimant has the following severe impairments: morbid obesity, compensated congestive heart failure, degenerative changes of the spine and hips, sleep apnea, and hypertension (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity (20 CFR 404.1545 and 416.945) to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), with the following additional limitations: no climbing of ladders, ropes, or scaffolds, or crawling; occasional climbing of ramps and stairs, balancing, stooping, kneeling, and crouching; no concentrated exposure to temperature extremes, humidity, or environmental pollutants; and no exposure to hazards (such as heights, machinery, and commercial driving) (20 CFR 404.1569a and 416.969a).

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on October **, 1968 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age upon his attainment of age 50 on October **, 2018 (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 10, 2018, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 13-19.

### V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v.Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so

because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI. ANALYSIS

Pettiford argues that the ALJ erred when he failed to recognize his bilateral knee osteoarthritis as a severe impairment despite substantial evidence that that condition limited his functioning "considerably," and failed to explain why he did not include limitations for his knee impairment in his RFC assessment. Doc. No. 16, pp. 9-12. Defendant argues that the ALJ sufficiently analyzed Pettiford's knee impairment and explained why it did not justify greater restrictions in the RFC. Doc.

No. 17.

At step two of the sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) & 416.920(a)(4)(ii). To determine if a claimant has a severe impairment, the ALJ must find that an impairment or combination of impairments significantly limits the claimant's physical or mental ability to do "basic work activities." *See* 20 C.F.R. § 416.920(c). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243, n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). When an ALJ finds both severe and non-severe impairments at step two and continues with subsequent steps in the sequential evaluation process, error, if any, at step two may not warrant reversal. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at step two is not reversible error when the ALJ continues through the remaining steps of the evaluation and can consider non-severe impairments when assessing an RFC); *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008); *Hedges v. Comm'r of Soc. Sec.*, 725 F. App'x 394, 395 (6th Cir. 2018). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider the limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (emphasis in original, quoting SSR 96-8p).

When the ALJ fails to consider the claimant's non-severe impairment when assessing the RFC, a step two error is not harmless. *See White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787-788 (6th Cir. 2009) (reversing because the ALJ did not consider the claimant's combined severe and non-severe impairments when formulating the RFC); *Tuck v. Astrue*, 2008 WL 474411, at *8 (W.D. Ky. Feb. 19, 2008) (distinguishing *Maziarz* because "the record is not sufficiently developed [in this case] to

14

determine whether at the fourth and fifth steps plaintiff has been prejudiced by the ALJ's error at the second step."); *Jamison v. Comm'r of Soc. Sec.*, 2008 WL 2795740, at *9 (S.D. Ohio July 18, 2008) ("*Maziarz* is distinguishable from the instant case because it is not clear that the ALJ considered plaintiff's cardiac impairment at the other steps of the sequential evaluation process."); *Hart v. Comm'r of Soc. Sec.*, 2016 WL 6997906, at *4 (W.D. Mich. Nov. 30, 2016) ("[T]he record does not reflect that the ALJ considered the limitations and restrictions imposed by all of Plaintiff's impairments. The ALJ's [step 2] error here, therefore, is not harmless."); *see also Ortega v. Comm'r of Soc. Sec.*, 2021 WL 2942240, at *8 (N.D. Ohio June 21, 2021) (ALJ's error at step two reversible because the ALJ failed to evaluate a non-severe impairment when formulating the RFC).[4]

Here, the ALJ did not mention Pettiford's knee impairment at step two, precluding this Court from evaluating the ALJ's step two finding. That failure was error because there is evidence in the record indicating that Pettiford's knee impairment, alone or in combination with his other impairments, "significantly limits" his physical ability to do "basic work activities." 20 C.F.R. § 416.920(c); *Rogers*, 486 F.3d at 243, n.2. The ALJ's step two error is not reversible so long as the ALJ continued through the remaining steps of the evaluation and considered Pettiford's knee impairment when assessing the RFC. *Maziarz*, 837 F.2d at 244. The Court finds that the ALJ's decision at the remaining steps of the evaluation does not contain an adequate discussion of Pettiford's knee impairment, and it cannot be said whether and to what extent the ALJ considered it when assessing the RFC.

For instance, the ALJ described Pettiford's allegations regarding his symptoms at the hearing but did not mention that Pettiford had reported knee arthritis at the hearing. Tr. 15, Tr. 148. The ALJ's first mention of Pettiford's knees is a reference to an ER visit on November 29, 2019. Tr. 16. The ALJ did not mention a visit to rheumatology on September 5, 2019, for right knee pain and reported popping and

---

[4] Report and recommendation adopted, *Ortega v. Comm'r of Soc. Sec.*, 2021 WL 2941127 (N.D. Ohio July 13, 2021).

buckling and that it worsened with activity. Tr. 601. Pettiford's knee pain was assessed as a likely osteoarthritis flare and x-rays were ordered, which showed "2 mm medial joint space remaining, patellofemoral narrowing and spurring but cannot assess amount without patellar views." Tr. 601. Although the ALJ discussed a September 11, 2019 treatment note, he did not mention Pettiford's knee pain—the purpose of that visit—he only mentioned Pettiford's hips and back. Tr. 16; Tr. 600. He did not note that the reason for Pettiford's stiff gait was due to his right knee, or comment upon his right knee tenderness, moderate crepitus, patella grind, and pain upon McMurry's testing. Tr. 600. The ALJ discussed Pettiford's evaluation for physical therapy in October 2019 but did not mention that he was referred for knee osteoarthritis as well as back pain. Tr. 630.

The ALJ did not discuss a November 19, 2019 visit with Dr. Downes, at which Pettiford complained of being "in pain" from his knees and back, had a decreased range of motion in his knees and spasms in his low back, his joint pain was assessed as "uncontrolled," and Dr. Downes opined that Pettiford's increased blood pressure was likely due to pain. Tr. 622, 623. The ALJ recounted that Pettiford went to the emergency room on November 29, 2019 for "increased pain," although the ALJ did not specify that it was right knee pain. Tr. 16, Tr. 657. The ALJ commented that x-rays showed moderate joint effusion in Pettiford's right knee and that at a follow-up visit he had a limited range of motion in his right knee and intact strength in his lower extremities. Tr. 16. However, the ALJ did not mention that Pettiford's right knee was still swollen, his gait was still stiff from his right knee, and that he received a cortisone injection. Tr. Tr. 655, 656. And although the ALJ remarked that Pettiford had reported at his November visit to the emergency room that he was not taking his prescribed pain medication, that record also shows that he advised that he was not sure what he could take (Tr. 657); he

later indicated that he did not take oral NSAIDs due to his chronic kidney disease (Tr. 655).[5] Finally, while the ALJ discounted the state agency reviewers' opinions regarding postural limitations due to "lower extremity impairments" (Tr. 17), it is not evident what impairments the ALJ is referring to. Because the ALJ omitted a large portion of Pettiford's evidence referencing his knee impairment and did not offer a conclusion with respect to the evidence that he did cite, the Court is unable to evaluate whether and to what extent the ALJ considered Pettiford's knee impairment when assessing the RFC.

      Defendant asserts that the ALJ "reasonably found that Plaintiff could perform a reduced range of light work, given his ability to work with similar symptomology before and his improvement with treatment, medication, and other conservative and routine care (Tr. 15-19)." Doc. No. 17, p. 8. The ALJ's comment that Pettiford had a long history of hypertension and chest pain prior to his alleged onset date when he was still working has no bearing on his knee impairment, which developed after the alleged onset date and after he had stopped working. To the extent the ALJ noted improvement in Pettiford's conditions with treatment, he did so, with accuracy, with respect to his heart condition. Tr. 15-16. With respect to his musculoskeletal issues, the ALJ stated that Pettiford "made some limited progress with therapy and was advised to start aerobic activity (Exhibit 7F at 13)." Tr. 16. That treatment note, Pettiford's second physical therapy note, does indicate that Pettiford had made "some limited progress" with his lumbar range of motion but does not indicate that he made any progress with his knee. In fact, he was unable to perform one of his lumbar exercises due to pain in his lower extremities and that exercise was put on "hold for now." Tr. 629.

      Defendant submits that the ALJ "reasonably found Plaintiff maintained the ability to perform a range of light work given that while he had some abnormalities observed, overall there were relatively

---

[5] The ALJ also found that Pettiford "reported that he is able to climb the stairs in his home." Tr. 16 (citing Exhibit 7F at 13-14). To clarify, Pettiford lived in an apartment on the first floor and reported he walked up 2 steps to enter his apartment. Tr. 631, 147.

unremarkable examination findings with full strength, intact sensation, as well as normal gait (Tr. 16, 601, 604, 629, 657)." Doc. No. 17, p. 8. But the ALJ's decision at Tr. 16 does not indicate that the ALJ came to any conclusions based on a "normal gait." Indeed, the ALJ cited two gait findings when recounting the evidence—a "stiff gait" and a "slow gait." Tr. 16. The ALJ did observe that Pettiford presented with a "regular gait" at his consultative exam (Tr. 17), but that exam occurred before his knee impairment developed.

Defendant submits that Pettiford has not met his burden to show that his right knee condition caused functional limitations. Doc. No. 17, p. 7. But the evidence of record shows that Pettiford reported issues with his right knee that caused functional limitations. Tr. 600 (knee pain exacerbated by walking, putting on shoes and clothes); 601 (pain worse with activity, knee sometimes buckles and almost gives out); 631 (difficulty standing and walking long distances); 657 (pain lifting leg, bending knee, unable to bear weight); 655 (sharp, tight pain in knee exacerbated by prolonged walking); see also Tr. 620 (Dr. Downes commenting that Pettiford's high blood pressure that day was likely caused by knee and back pain). Moreover, the Court notes that Pettiford, who was proceeding *pro se* at the hearing, was given little opportunity or encouragement to explain his conditions and how they impacted him.[6] *See, e.g.*, Tr. 146, 148. On remand, the ALJ will have an opportunity to reevaluate Pettiford's impairments, including holding a new hearing.[7]

For all the reasons explained above, the ALJ's failure to find Pettiford's knee impairment to be severe at step two is not harmless error because it is not clear whether and to what extent the ALJ considered Pettiford's limitations from that impairment when assessing the RFC. Thus, the Commissioner's decision must be reversed. *See White*, 312 F. App'x 779, 787-788; *Hart*, 2016 WL

---

[6] The record indicates that Pettiford's hearing lasted 17 minutes.

[7] Pettiford also argues that the ALJ erred when he evaluated Dr. Bradford's opinion. On remand, the ALJ will have an opportunity to reconsider Dr. Bradford's opinion.

6997906, at *4, 8.

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED AND REMANDED for further proceedings consistent with this opinion.

    **IT IS SO ORDERED.**

Date: January 11, 2022             <u>*s/ Jonathan Greenberg*</u>
                                                              Jonathan D. Greenberg
                                                              United States Magistrate Judge